## W. H. SHIRLEY v. THE STATE.

*No. 992.  Decided June 10th, 1896.*

### 1.  Murder—Insanity—Continuance.

On a trial for murder, an application for continuance, for witnesses as to defendant's insanity, which simply states that the witnesses would testify to, "acts, words and deeds" (what not being stated) leading to insanity, and which occurred before the killing," are statements too general in character, and only conclusions at best. And, as to the absent medical experts, the facts, upon which they were expected to base their opinion, that defendant was bordering on insanity, should also have been stated.

### 2.  Same—Suggestion of Defendant's Insanity at the Trial—Argument— Practice.

On a trial for murder, it having been suggested that defendant was then insane, a jury was empaneled to try that issue; and, when the evidence was heard, the court ruled that counsel for defendant should open and close the argument. Held: Defendant had no possible ground to complain as to this matter.

### 3.  Same—Expert Opinion Evidence—Hypothetical Case—Practice.

On a trial for murder, where the defense was insanity, and upon the hypothetical case submitted by the prosecution to the medical experts, they stated that, in their opinion, defendant was not only not insane, but was feigning insanity; and counsel for defendant objected that, the hypothetical case as stated, was not full and complete. Held: If not full, it was the duty of counsel for defendant to submit a case made up of all the testimony.

**4.  Same—Confessions and Admissions of Defendant While in Arrest.**

Where the sheriff testified, that, after defendant's arrest for the murder, he, the sheriff, warned him that any statement he might make could be used against him, and not in his favor, whereupon defendant replied, "if that was the case he would not make any statement." Held: The evidence was not calculated to mislead the jury or prejudice the defendant, the reply not being a confession or admission by defendant, but only a declination, on his part, to make any statement at all.

APPEAL from the District Court of Coleman.   Tried below before Hon. J. O. WOODWARD.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of L. L. Woodward, on the 27th of November, 1895, by shooting him with a gun and a pistol.

The deceased, Woodward, owned a farm in Coleman County, some eight or nine miles from the town of Santa Anna.   He rented this farm to appellant and moved to the Indian Territory.   After the expiration of the first year's rental contract, J. D. Simpson, as agent for Woodward, renewed the contract with defendant for another year (1895). Defendant violated his obligations under this contract by failing to cultivate as much land as he agreed to do; by cutting timber and selling wood; by suffering the fencing of the premises to become dilapidated, and by burning rails from around the house for firewood.   He also sold the cotton and other produce without accounting for the rent portion to Simpson or Woodward.   When Simpson remonstrated with him, he became very mad and refused to speak to him.   During this period, he had business transactions and accounts with several merchants at Santa Anna, all of whom testified he was a good business man, as did also most of his neighbors; and that he was not insane, nor was there anything the matter with him except that he was deaf, and particularly so at times when he did not wish to hear.   He transacted all of his business himself, and no one had ever heard or suspected that he was insane.   On the 26th of November, L. L. Woodward and his son came from their home in the Indian Territory to look after the farm and have a rent settlement with appellant.   They left the town of Santa Anna on the 27th, in a wagon, to go to the farm.   On the road they met appellant, who was going to town.   They had some talk with him, and it was understood that appellant would return and meet Woodward at the farm at noon.   Woodward and his son went on to a neighbor's where they took dinner, and at 3 o'clock Woodward went on horseback alone over to appellant's.   At noontime, appellant had gone to town, where he had his horse shod and bought some Winchester 44-calibre cartridges.   He got back home about noon, ate his dinner and then tied up some clothing in a bundle.   He then went out into the yard and fired his Winchester several times at spots on the trees, and came back into the house and worked with and fixed up his gun.   His mother-in-law, Mrs. Wilkerson, who was living with them, testified that after he had fixed his gun, he would go with it

in his hand first to one and then the other window in the room and look out. That just before Woodward arrived, appellant's wife told her for her and the children to go out into the dugout. Mrs. Wilkerson says, she had only been out of the house a few seconds and had just turned the corner of the house when she heard Woodward say, "Oh, don't; don't," and then heard two shots fired in quick succession; and, as she looked around, Woodward was falling off his horse. He was killed instantly. Immediately after the shooting, defendant came out of the door, ran to the lot where his horse was, mounted it and fled. On the first Monday in December he was arrested at a Mexican camp near Brownwood, by Bell, the sheriff of Brown County. Bell says: "After I arrested him he started to tell me about the killing of Woodward, and before he told me about it, I told him and cautioned him that whatever he told me about it might and could be used as evidence against him, but not in his favor; and then he said, if that is the case I will not say anything about it till I see an attorney. And, after I had so cautioned him, he asked me, if I was an officer? I told him I was, and he then said, that is all I want to know that I am not in the hands of a mob. I first saw him at a distance of about one hundred yards at the Mexican camp, and slipped and got in about ten feet of him before he seemed to notice me and walked up to him, caught hold of him, felt for arms, found a pistol on his person, took it, and carried him to jail at Brownwood."

He was placed in jail in Coleman on the 10th of December, and remained confined therein until February. About ten days after he was put in the jail, he commenced feigning insanity. Gilleland, who was confined in the cell with him, testified as to what he said and how he acted; and Gilleland was satisfied that he was not insane, but was feigning insanity.

Ben Clark, the jailer, testified to the same effect. Appellant was examined several times by Drs. Alexander, Beaumont and other physicians, during his incarceration. Before the trial and at the trial, the two above named testified, that appellant was "perfectly sane at this time and that in his present actions and demeanor, he is simply feigning insanity;" and they gave their reasons fully for so believing and knowing, and the test to which they had subjected the appellant in their examinations. They also testified as to his sanity judged in the light of the other testimony pro and con, upon the subject, and pronounced appellant a sane man.

The above are substantially the facts in the case.

*W. E. Smith,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

[No brief for the State found with the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, the death penalty being assessed against him, and he pros-

ecutes this appeal. When the case was called for trial, appellant filed his first application for a continuance on account of the absence of Mrs. John Cupps, Dr. Hartman, Dr. Wood, and Dr. March. By Drs. Hartman and Wood he expected to prove that they "each attended W. H. Shirley (the defendant), and that the defendant was then diseased in his head, and that the mental condition of the defendant was greatly impaired. By the witness, Dr. March, that he was the family physician of defendant, and that he had specially examined the defendant, and that he believed the defendant was bordering on insanity, and that in a few years he would not be able to attend to business, and that when the disease with which he was suffering struck his brain, he would be deranged. By Mrs. John Cupps, the defendant's acts, words, and deeds, which words, acts, and deeds are and were leading to insanity, and which occurred before the killing." The facts expected to be proved are too generally stated. They are simply conclusions, and the matters and things upon which the physicians are supposed to base their conclusions as to their belief that the defendant was bordering on insanity are not stated. Nor are the "acts, words, and deeds" expected to be shown by Mrs. Cupps stated, nor how long they occurred before the killing. Even if the doctors had stated the facts upon which they based their belief, it would be insufficient, because the application for continuance states, while it indicates the defendant was bordering on insanity, that it was a few years in the future before he would be unable to attend to business, and before the disease with which he was suffering would strike his brain. That would be too late for this case, because the homicide had already been committed. When the case was called for trial, affidavit was made, under the statute, suggesting that the defendant was then insane, and should not be tried. A jury was empaneled, the State took the burden of establishing sanity, and introduced its evidence, and counsel for the defendant then introduced evidence for the purpose of establishing insanity. When the evidence had closed, the court ruled that counsel for appellant should open and close the argument in the case. In this there was no possible injury to the appellant, for, whether the burden of proof was upon the appellant to make good the suggestion of insanity, or whether the State showed sanity, certainly appellant could not complain, when he was awarded the right to open and conclude the argument. Bills of exception Nos. 3, 5, and 6 all present the same matter. Upon the trial, counsel for the State submitted to the two physicians, G. B. Beaumont and C. M. Alexander, a hypothetical case. The physicians gave as their opinion that the appellant was not only sane, but that he was feigning insanity. Counsel for appellant objected to this opinion, because the hypothetical case was not full, and did not introduce the testimony introduced by appellant tending to show insanity. This objection was not well taken. If not satisfied with the hypothetical case submitted to the doctors by counsel for State, it was the duty of the counsel for appellant to submit a case made up of all the testimony. Again, the opinion of the doctors was not based upon

the testimony that they had heard alone; but they had made examinations of the appellant, had observed his conduct, and the opinion was based upon the evidence delivered by the witnesses and their personal observation of the conduct of the appellant. It appears that the defendant was warned by Sheriff Bell, after his arrest on this charge. The sheriff stated to him "that it was his duty as an officer to tell him that any statement he might make to him might be used against him, but could not be used in his favor. After this the defendant replied that, if that was the case, he would not make any statement." Appellant objects to this on the ground that the answer of appellant was calculated to mislead the jury and prejudice him. If this was a confession, the defendant having been duly warned, certainly it could be used against him, and the contention of the appellant would signify that it was of that character. The view we place upon it, however, is, not that, if defendant made a statement, it would be prejudicial to him, but that, when he learned from the sheriff that what he said could not be used in his favor, he then declined to make any statement at all. This, it occurs to us, is the obvious construction of the reply of the appellant. It occurs to us that the testimony was not calculated to prejudice the appellant, and that the exception is rather frivolous than otherwise. We have thoroughly examined the record, and in our opinion the evidence in this case amply justified the jury in finding the defendant guilty of murder in the first degree. The judgment of the lower court is affirmed.

*Affirmed.*